UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                           )
ANTWAN GONSALVES,                          )
                                           )
            Petitioner,                    )
                                           )
v.                                         )        Civil Action No. 22-11994-RGS
                                           )
MICHAEL RODRIGUES,                         )
                                           )
            Respondent.                    )
_____)

REPORT AND RECOMMENDATION ON PETITION FOR WRIT OF
HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254

June 24, 2024

Boal, M.J.

On November 16, 2022, Antwan Gonsalves, who is currently serving a life sentence at a
Massachusetts correctional facility, filed pro se a petition for a writ of habeas corpus pursuant to
28 U.S.C. § 2254. Docket No. 1. For the following reasons, this Court recommends that Judge
Stearns deny the petition.[1]

I.       BACKGROUND

         A.       Procedural History

         On February 22, 2017, a jury found Gonsalves guilty of murder in the first degree on the
theory of extreme atrocity or cruelty in violation of M.G.L. c. 265, § 1. Docket No. 19-10 at 4.
The trial judge sentenced Gonsalves to a mandatory term of imprisonment of life without parole.

_____
[1] On January 20, 2023, Judge Stearns referred Gonsalves' petition to the undersigned for a report
and recommendation. Docket No. 23.

Docket No. 19-11 at 6. Gonsalves filed a notice of appeal on March 27, 2017. Docket No. 19-1 at 13.

On July 17, 2019, Gonsalves filed a motion for a new trial in the Supreme Judicial Court ("SJC"). Docket No. 19-1 at 14. The SJC remanded that motion to the trial court and ordered that any appeal be consolidated with the appeal of Gonsalves' conviction. Id. On September 16, 2020, the Massachusetts Superior Court denied Gonsalves' motion. Id. at 15. Gonsalves thereafter filed a notice of appeal on September 21, 2020. Id. On January 13, 2022, the SJC denied relief under M.G.L. c. 278 § 33E[2] and affirmed both Gonsalves' conviction and the order denying his motion for a new trial. Docket No. 19-1 at 527-41; Commonwealth v. Gonsalves, 488 Mass. 827 (2022).

On November 16, 2022, Gonsalves filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the District of Massachusetts, asserting the following grounds for relief:

1.    Ineffective assistance of counsel in violation of the Sixth Amendment because:

(a) counsel failed to impeach the two main witnesses with their criminal records;

(b) counsel failed to object to a witness' opinion evidence that Gonsalves was a murderer and failed to object to the prosecutor's argument that repeated the opinion and bolstered the testimony;

---

[2] Section 33E provides, in pertinent part:

In a capital case [such as the case here] the entry in the supreme judicial court shall transfer to that court the whole case for its consideration of the law and the evidence. Upon such consideration the court may, if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence. . . .

M.G.L. c. 278 § 33E.

(c) counsel failed to object to and move to strike the witness' testimony that she decided to incriminate Gonsalves after she spoke to God;

(d) counsel failed to object to the prosecutor's questions regarding a witness' fear of Gonsalves and then, after the jury sent a note during deliberations evidencing their fear, failed to request a curative instruction; and

(e) the motion judge abused his discretion by denying Gonsalves' motion for a new trial.[3]

2.      Insufficient evidence to prove beyond a reasonable doubt that Gonsalves was guilty of extreme atrocity and cruelty in violation of the Fifth Amendment.

Docket No. 1 at 5, 7, 16.

On January 19, 2023, the Commonwealth filed its answer.[4] Docket No. 19. Gonsalves filed a memorandum in support of his petition on May 17, 2023. Docket No. 31. On June 22, 2023, the Commonwealth filed its opposition. Docket No. 34. Gonsalves filed a reply on August 24, 2023. Docket No. 38.

B.      Facts

The SJC set forth the following facts "as the jury could have found them."[5]

1. Events surrounding the stabbing. The defendant was in the Central Square area of Cambridge on the night of September 11, 2015, into the early morning of September 12 with Georgette Bethune and Maurice Rascoe. Bethune had known the defendant for two and one-half to three years, but had been dating him and

---

[3] Gonsalves in his petition states that "the motion judge abused its discretion in denying the new trial motion." Docket No. 1 at 16. He does not elaborate on this ground at any point in his memorandum. When a party perfunctorily raises an argument but subsequently fails to develop or support it with any authority, it is deemed waived. United States v. Diggins, 36 F.4th 302, 319 (1st Cir. 2022). Accordingly, this Court recommends that Judge Stearns find that Gonsalves' claim, if any, regarding the denial of his motion for new trial is waived.

[4] In its answer, the Commonwealth states as a defense that the "petition should be denied to the extent that the petitioner is asserting any claim or portion of a claim that was not properly exhausted in state court." Docket No. 19 at 6. In his reply, Gonsalves makes arguments apparently to rebut a failure to exhaust defense by the Commonwealth. See Docket No. 38. The Commonwealth, however, makes no such arguments in its memorandum.

[5] Absent clear and convincing evidence to the contrary, the SJC's recitation of the facts is presumed to be correct. See 28 U.S.C. § 2254(e)(1); Field v. Hallett, 37 F.4th 8, 16 (1st Cir. 2022).

letting him stay with her and her son at her apartment for a couple of months. Rascoe had known the defendant for about ten years and considered him a friend. Both had met the defendant because he regularly sold them small amounts of marijuana. Neither had met the other before, and they did not speak again after September 12, 2015.

The two met up with the defendant at around 11 P.M. at a restaurant in Cambridge. Bethune testified that the defendant was wearing khaki pants and a black shirt. They then left to go to a bar in the defendant's car. The car was a dark blue, two-door Mercedes-Benz "hatchback." It had a "for sale" sign in the rear passenger's side window. Registry of motor vehicles (RMV) records show that the defendant owned a blue, two-door Mercedes-Benz at the time.

The three then went to a bar on Massachusetts Avenue. They were only there about twenty minutes when Rascoe asked to be driven home to Malden. Around this time, Rascoe realized his cell phone's battery was dead, and borrowed the defendant's cell phone to call his girlfriend to let her know that he was coming home. Cell phone records show two short calls from the defendant's cell phone to Rascoe's girlfriend's cell phone at 1:35 A.M. and 1:36 A.M.; Rascoe testified that he made these calls either inside or in front of the bar as they were leaving. The three got into the car with the defendant in the driver's seat, Bethune in the front passenger's seat, and Rascoe in the back.

Around this time, the victim was also socializing with some friends in Central Square. At around 1:30 A.M., the group visited a convenience store on Massachusetts Avenue, near the bar. The victim left to find a bathroom while his friends were still in the store.

Devon Queen, who was smoking cigarettes outside the convenience store, approached the victim to ask him for marijuana. He did not know the victim, but thought the victim sold marijuana because he could smell it on the victim. The victim said to hold on and walked down the street to the defendant's car. Queen could hear yelling, but not specifically what was being said, although he did hear the victim say something about drugs.

The victim had approached the front passenger's side window, where Bethune was sitting, and began talking about drugs.[6] The victim said that he "got it all" and asked if they wanted "crack" cocaine. According to Bethune, the defendant asked something like, "Why is this guy out here?" or "Why are you guys out here?" Rascoe testified that he responded by laughing, but took it as an insult because he did not think the group looked like the type of people who would buy crack cocaine. The defendant responded by saying, "Get the fuck away from my car." He was not

---

[6] Footnote 1 of the SJC decision, inserted at this point, states: "Rascoe testified that two people approached the car, but said that the second man was no longer at the scene when he and the defendant left the car or during the fight."

yelling, but his tone was serious. The victim backed up onto the sidewalk and did not initiate any further contact with the people in the car, but the defendant got out of the car and approached him, and Rascoe got out to follow the defendant. Rascoe testified that the defendant was arguing with the victim with "arms flailing" and that the defendant brushed off Rascoe's attempts to pull him away from the altercation.

Bethune saw the defendant "punching" the man with an underhand motion three times. The man had one hand in or on his pocket and was holding the defendant by the shirt with his other hand. She did not see anyone else involved in the fight, including Rascoe. Rascoe also testified that, besides his attempts to pull the defendant away, no one tried to interfere with the fight.

The victim came back towards the convenience store and fell down in front of Queen. At some point Rascoe picked up the victim's cell phone. He made conflicting statements on whether he picked it up from the ground, took it from the victim's pocket, or did not remember from where he got it. He also said he did not know that it was the victim's cell phone, but admitted that he knew it was not his or the defendant's.

The defendant and Rascoe reentered the car through the driver's side and made a U-turn to head towards Harvard Square. The defendant had a bloody knife in his hand, which he wiped off on his shirt and threw out the window at some point during the drive. Bethune testified that it was a black switchblade with a dragon on the handle, and that she had seen the knife before. The defendant repeatedly said that he "poked the n---- up" or that he "poked the kid." Bethune was upset that the defendant had gotten in a fight with the man in front of a group of people, and was worried that the man's friends would retaliate. Upon learning that the defendant had stabbed someone, Rascoe threw the cell phone he had picked up out of the window.

The victim came back into the convenience store, bleeding but conscious, and collapsed again. The cashier called 911 while the victim's friends attempted to help him. Eventually some off-duty doctors who were in the area entered the store and began to treat the victim. An ambulance arrived and took the victim to Massachusetts General Hospital. He was pronounced dead at 4:21 A.M.

The cause of death was stab wounds to the chest and abdomen. The autopsy revealed five separate stab wounds. The first stab wound was one and one-half to two inches deep and passed between two ribs at a slightly upward angle into the right lung, causing bleeding into the chest cavity and air to escape the lungs. The second wound penetrated the sternum and pierced the heart. The third penetrated about two inches into the victim at a slightly upward angle, and passed between two ribs into the liver. The fourth penetrated four inches into the victim and hit both the liver and a major blood vessel. The fifth wound was three inches deep and passed through the abdominal wall at an upward angle into the liver. One of the

stab wounds caused two separate injuries to the liver, indicating either that the victim moved while the knife was in his abdomen or that the knife was partially withdrawn and then stabbed inwards again. Each of the stab wounds could have been independently fatal.

2. Defendant's movements after the stabbing. The group drove to Rascoe's house in Malden, where they continued to drink. Bethune testified that the defendant changed his shirt at Rascoe's house. The defendant and Bethune stayed for one to one and one-half hours before driving to Bethune's apartment.

The next morning, the defendant was "uncomfortable and frantic." He asked Bethune why she did not stop him from getting out of the car. He said that he was going to get rid of his car and asked Bethune to remove the "for sale" sign from the window, although she did not comply. He left Bethune's apartment that morning without telling her where he was going, and Bethune never saw him again until she testified at trial. At some point he called her to say that "the guy died," which, up to that point, Bethune did not know. She communicated with the defendant a few more times by telephone over the next couple of days, although he told her not to call him on his old number because it was "gone" and when he called Bethune his telephone number would appear as "unknown."

At around the time the defendant left Bethune's apartment, Rascoe realized he had left his cell phone in the defendant's car. Unaware of the victim's condition, he arranged to meet the defendant. Rascoe brought along his girlfriend and two of their children. The defendant arrived in the two-door Mercedes-Benz, but Rascoe noticed that the "for sale" sign had been removed. Thereafter, he did not see the defendant or have any contact with him until trial, despite trying to get in touch with him after hearing about the death in Central Square.

Later on September 12, the defendant went to a prearranged rendezvous in Framingham with Keila Gonzalez, another woman he had been seeing for a couple of weeks. The two usually met up on weekends in Connecticut, where Gonzalez lived. However, that weekend they were instead meeting in Framingham so that the defendant could go back to Cambridge for the sixtieth birthday party of Debra Gonsalves, his aunt and adoptive mother. Without explaining why, the defendant canceled his plans to attend the party, and they spent the rest of the weekend in Hartford, Connecticut, instead. The defendant left on the following Monday and did not contact Gonzalez again. During this time, the defendant was driving the Mercedes-Benz, but Gonzalez did not mention seeing the "for sale" sign. Police were unable to locate the vehicle.

3. Investigation into the killing. The police requested surveillance footage from inside the convenience store and the surrounding streets. None showed the stabbing or the fight that led up to it. However, footage did show the victim fall down outside the doors of the store, where he was approached by a man wearing khaki pants and a man wearing a large watch, who bent over to pick something up. It also showed

a dark, two-door car make a U-turn on Massachusetts Avenue and be driven away from the scene of the murder.

Two witnesses that were on Massachusetts Avenue told police they saw a dark-colored, two-door Mercedes-Benz with a "for sale" sign around the time of the murder. One said he saw a fight break out on the sidewalk before the Mercedes-Benz made a sharp turn and went towards Harvard Square. The other, the doorman at the bar, remembered seeing the Mercedes-Benz being parked illegally in a handicap spot and telling the driver to move into a legal spot. The driver, who the doorman described as "real small," told the doorman that his mother, "Debbie," was already at the bar. Evidently, this led the police to Debra Gonsalves, and her adoptive son, the defendant. RMV records revealed that the defendant was five feet, two inches tall and owned a car matching the descriptions given by the eyewitnesses.

The defendant's cell phone records showed two calls to Rascoe's girlfriend's cell phone around the time of the murder. Police went to her apartment to interview her, but no one answered the door. They noticed that the name "Rascoe" was on the mailbox. When they returned later, they noticed that the name had been removed. While interviewing Rascoe's girlfriend at her apartment, she revealed that Rascoe had been the one using the defendant's cell phone, and that Rascoe was upstairs. Rascoe went with the officers to the police station, where he consented to having his cell phone searched, and gave a two and one-half hour long interview. He initially denied witnessing or being involved in the murder, but later admitted that he got out of the car as a "peacemaker" and that the defendant said he "poked" the victim. He also volunteered that he was the man wearing the large watch who could be seen removing something from the defendant's pocket in the convenience store's surveillance video recording.

The police also attempted to interview Bethune. At first she denied any knowledge of the stabbing. The police seized her cell phone, so she bought a new one to get in touch with the defendant to tell him that the police "pretty much [knew] every single thing." She was subpoenaed to appear before the grand jury but failed to appear and was arrested. After spending the night in jail, she testified before the grand jury, admitting that she saw the defendant fighting with the victim, that he had a bloody knife when he got back into the car, and that he had admitted to the stabbing on the car ride to Rascoe's home.

The defendant turned himself in to police on September 24.

Gonsalves, 488 Mass. at 828-33.

II.    HABEAS CORPUS STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254

("AEDPA") presents a "formidable barrier" limiting the availability of habeas relief where state courts have adjudicated the merits of a prisoner's claims. Burt v. Titlow, 571 U.S. 12, 19 (2013). Gonsalves cannot obtain federal habeas relief under 28 U.S.C. § 2254(d) for any claim that a state court "adjudicated on the merits" unless he can show that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Rashad v. Walsh, 300 F.3d 27, 34 (1st Cir. 2002). In other words, state court decisions merit substantial deference.

As the Supreme Court repeatedly has emphasized, such deference results in a federal habeas corpus standard that is "difficult to meet," with the petitioner carrying a heavy burden of proof. Harrington v. Richter, 562 U.S. 86, 102 (2011); accord Cullen v. Pinholster, 563 U.S. 170, 181 (2011). If a state court's decision "was reasonable, it cannot be disturbed." Hardy v. Cross, 565 U.S. 65, 72 (2011); see Parker v. Matthews, 567 U.S. 37, 38 (2012) (emphasizing federal habeas courts may not "second-guess the reasonable decisions of state courts" (internal quotation and citation omitted)).

The state court is not required to cite, or even have an awareness of, governing Supreme Court precedents, "so long as neither the reasoning nor the result of [its] decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002); cf. Harrington, 562 U.S. at 100 ("§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits'" and entitled to deference). For a habeas petitioner to prevail under this daunting standard, the state court judgment must contradict clearly established decisions of the Supreme Court, not merely law articulated by any federal court. Williams v. Taylor, 529 U.S.

362, 404-05 (2000); see Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).[7]

The "contrary to" prong is satisfied when the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," Williams, 529 U.S. at 405, or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different] result." Id. at 406 (internal citation omitted).

The "unreasonable application" prong is satisfied if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. When making the "unreasonable application" inquiry, federal habeas courts must determine "whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. An unreasonable application of the correct rule can include the unreasonable extension of that rule to a new context where it should not apply, as well as an unreasonable failure to extend the rule to a new context where it should apply. Id. at 407. It cannot, however, include a decision by a state court not "to apply a specific legal rule that has not been squarely established by [the Supreme Court]." Knowles, 556 U.S. at 122. Once again, this assessment is limited to federal law as

---

[7] In determining what constitutes "clearly established Federal law," petitioners can generally look to all settled federal law as of the time the state court conviction at issue became "final." Williams, 529 U.S. at 390; see Teague v. Lane, 489 U.S. 288, 295-96 (1989). That occurs upon the completion of (or the running of the time for filing) certiorari proceedings in the Supreme Court following state court direct review. See Williams, 529 U.S. at 390; Teague, 489 U.S. at 295-96. However, Supreme Court decisions issued after finality may be considered if they shed light on the meaning and application of a rule that the Supreme Court had previously established before the state court decision became final. See, e.g., Johnson v. Bagley, 544 F.3d 592, 599 (6th Cir. 2008) (considering Supreme Court opinions that postdate state court decision on ineffective assistance claim because they did not rest on new law but instead applied the "clearly established" precedent of Strickland); Williams v. Allen, 542 F.3d 1326, 1338 n.7 (11th Cir. 2008) (same).

articulated by the Supreme Court, and not the lower federal courts. See Lopez v. Smith, 574 U.S. 1, 6 (2014). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004); accord Matthews, 567 U.S. at 48.

A showing of clear error is not sufficient for a habeas petitioner to establish entitlement to relief. Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003); accord McCambridge v. Hall, 303 F.3d 24, 36–37 (1st Cir. 2002). Rather, relief is available only where a state court's "determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); accord L'Abbe v. DiPaolo, 311 F.3d 93, 96 (1st Cir. 2002); see also Harrington, 562 U.S. at 103 (requiring a petitioner to "show that the state court's ruling . . . was so lacking in justification that there was an . . . error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement").

Further, even if a state court decision is contrary to, or an unreasonable application of, established federal law, a petitioner is not entitled to habeas relief unless harm resulted. The standard for determining whether relief must be granted is whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." Fry v. Pliler, 551 U.S. 112, 121 (2007) (quoting Brecht v. Abrahamson, 507 U.S. 619, 631 (1993)); see also Connolly v. Roden, 752 F.3d 505, 510-11 (1st Cir. 2014).

III.   ANALYSIS

A.   Ground One: Ineffective Assistance Of Counsel

Gonsalves contends that trial counsel's multiple errors denied him effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution. Docket Nos. 1 at 5, 16; 31 at 10-19.

1.      <u>Ineffective Assistance Of Counsel Standard</u>

The Sixth Amendment provides that "[in] all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defense." U.S. CONST., amend. VI. The right to assistance of counsel implicitly includes the right to <u>effective</u> counsel. <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984) (emphasis added).

Clearly established federal law governing ineffective assistance of counsel claims is based primarily on the principles set forth in <u>Strickland</u>. Under the <u>Strickland</u> analysis, Gonsalves must show that: (1) counsel's performance was deficient, <u>i.e.</u>, counsel made errors so serious that counsel was not functioning as "counsel" as guaranteed by the Sixth Amendment; and (2) the deficient performance prejudiced the defense, <u>i.e.</u>, counsel's errors were so serious as to deprive the defendant of a fair trial. <u>Strickland</u>, 466 U.S. at 687.

Not every lawyerly slip constitutes ineffective assistance of counsel for Sixth Amendment purposes. <u>Id.</u> at 693. "Judicial scrutiny of counsel's performance must be highly deferential" and "every effort [should] be made to eliminate the distorting effects of hindsight." <u>Id.</u> at 689. This Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." <u>Camacho v. Zenk</u>, No. CV 16-11826-RGS, 2019 WL 3956255, at *1 (D. Mass. Aug. 22, 2019) (quoting <u>Strickland</u>, 466 U.S. at 689) (additional citations and internal quotation marks omitted).

To satisfy the first prong of the <u>Strickland</u> test, Gonsalves must show that trial counsel's performance was deficient to the point of being "objectively unreasonable." <u>See</u> <u>Companonio v. O'Brien</u>, 672 F.3d 101, 109 (1st Cir. 2012); <u>United States v. McGill</u>, 11 F.3d 223, 226 (1st Cir.

11

1993). Reasonable conduct falls "within the range of competence demanded of attorneys in criminal cases." United States v. Bosch, 584 F.2d 1113, 1121 (1st Cir. 1978) (quoting McMann v. Richardson, 397 U.S. 759, 770-71 (1970)). In other words, performance is constitutionally deficient "only if no competent attorney would have acted as [counsel] did." Companonio, 672 F.3d at 110 (citation omitted).

To establish prejudice, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "[T]he question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." Harrington, 562 U.S. at 111. Rather, "[t]he likelihood of a different result must be substantial, not just conceivable." Id. at 112.

2.    Discussion

The role of a federal habeas court in evaluating whether counsel's performance was deficient is to consider the performance subjectively from the point of view of trial counsel, and with a deferential slant to professional judgment. Ouber v. Guarino, 293 F.3d 19, 25 (1st Cir. 2002). "[A] reviewing court must not lean too heavily on hindsight" and should review a tactical decision on the basis of what counsel actually knew or should have known at the time they made the decision. Id. (citing Bell v. Cone, 535 U.S. 685, 701 (2002)) (citation omitted). A court "must respect counsel's strategic choices, recognizing that 'the law does not require counsel to raise every available non-frivolous defense.'" United States v. Arias, 94 F. Supp. 3d 93, 102 (D. Mass. 2015) (28 U.S.C. § 2255 case) (quoting Knowles, 556 U.S. at 127).

The SJC reviewed Gonsalves' ineffective assistance of counsel claim using the

"substantial likelihood of a miscarriage of justice" standard applicable in appeals of first degree murder convictions in Massachusetts. Gonsalves, 488 Mass. at 837 (citing Commonwealth v. Dowds, 483 Mass. 498, 502 (2019)); see also Knight v. Spencer, 447 F.3d 6, 10 (1st Cir. 2006) (citing M.C.L. c. 278, § 33E). The First Circuit has explained that the "miscarriage of justice" standard is more defendant-friendly than the Strickland one for evaluating a claim of ineffective assistance of counsel under federal law. Walker v. Medeiros, 911 F.3d 629, 636 (1st Cir. 2018). The "miscarriage of justice" standard therefore "'subsume[s]' the federal standard for determining when a Strickland violation has occurred, which means that it subsumes both the Strickland test for determining constitutionally deficient performance by defense counsel and the Strickland test for determining whether such deficient performance was prejudicial." Id. (internal citations omitted) (alterations in original).

Accordingly, the pivotal issue for this Court is whether the SJC decision was reasonable under the Strickland standard. Harrington, 562 U.S. at 101. "This is different from asking whether defense counsel's performance fell below Strickland's standard." Id. "Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d)." Id. at 105. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

Because the Strickland standard is a general one, the range of reasonable applications of Strickland is substantial. Harrington, 562 U.S. at 105. Further, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself." Id. at 101. The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. Id. at 105

(internal quotations and citations omitted).

        a.    <u>Failure To Impeach Witnesses With Their Own Criminal Records</u>

Gonsalves asserts that his counsel erred because she failed to impeach Rascoe and Bethune with their own criminal records. Docket No. 1 at 16.

At the time of trial, Rascoe had been convicted of larceny over $250, larceny from a person, two separate charges of assault and battery, witness intimidation, possession of a class D substance, possession of a class B substance with intent to distribute, disorderly conduct, and assault and battery on a police officer. <u>Gonsalves</u>, 488 Mass. at 838.

The SJC observed that defense counsel made the jury aware of one of the charges. <u>Id.</u> Counsel specifically made the jury aware that Rascoe was on probation for assault and battery on a police officer at the time of the murder and during trial. <u>Id.</u> In addition, defense counsel highlighted inconsistencies in Rascoe's statements to the police and even in his trial testimony, which the SJC observed placed the veracity of his full testimony in doubt. <u>Id.</u> She also inquired into Rascoe's personal involvement in the crime and his motivation to divert blame away from himself. <u>Id.</u> Various pieces of evidence were introduced that supported defense counsel's position. <u>Id.</u> Furthermore, she emphasized that Rascoe was testifying pursuant to an immunity order, and the judge specifically instructed the jury on what an immunity order involved and the statutory requirement that Gonsalves could not be convicted based solely on Rascoe's testimony, which, the SJC explained, implied that it could be unreliable. <u>Id.</u> at 838-39.

The SJC also found that defense counsel attacked and undermined the testimony and credibility of the other witness, Bethune. <u>Id.</u> at 839. Bethune was charged with assault and battery by means of a dangerous weapon for an event that happened after the murder and her grand jury testimony but before she testified at Gonsalves' trial. <u>Id.</u> at 838. As a result of defense

counsel's efforts, the SJC found that Bethune's "contradictions, concealments, vulnerabilities to police pressure, and drinking and smoking on the night in question were all before the jury." Id. at 839. In addition, the SJC pointed out that if Gonsalves had accused Bethune of being biased in light of a pending charge against her in another county, the judge could have allowed the Commonwealth to introduce prior consistent statements from before the charges were made. Id. Specifically, the SJC explained that by the time of Bethune's alleged assault (and the subsequent charges), she had already given testimony at the grand jury that was very similar to her testimony at trial. Id. The SJC reasoned that "the alleged bias evidence would have had very little significance to the jury, and would have only highlighted that Bethune made statements consistent with her trial testimony shortly after the murder occurred." Id.

In reviewing Gonsalves' claim, the SJC noted that "in most cases, 'failing to impeach a witness in a particular way does not constitute ineffective assistance.'" Gonsalves, 488 Mass. at 838 (quoting Commonwealth v. Watt, 484 Mass. 742, 763 (2020)). The SJC explained that Gonsalves' case was no exception, and even if "defense counsel could or should have used [the criminal records], her failure to do so did not create a substantial likelihood of a miscarriage of justice, because Rascoe and Bethune were already thoroughly impeached." Gonsalves, 488 Mass. at 838. The SJC noted that while there appeared to be a dispute over whether Gonsalves' counsel actually received the witnesses' criminal records, it did not need to resolve the issue because the attorney successfully impeached the witnesses without using their criminal records. Id. at 837 n.6.

Although trial counsel did not question the witnesses in the manner that Gonsalves would have preferred, she did thoroughly cross-examine them. "'There are countless ways to provide effective assistance in any given case,' and there is a 'strong presumption that counsel's conduct

falls within the wide range of reasonable professional assistance.'" <u>Thompson v. United States</u>, 64 F.4th 412, 421 (1st Cir. 2023) (quoting <u>Strickland</u>, 466 U.S. at 689) (additional citations omitted). This case presents no exception. The SJC's conclusions with respect to the trial attorney's cross-examination of witnesses were neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

> b.   Failure To Object To Opinion Testimony And The Subsequent <u>Reference By The Government That Gonsalves Was A "Murderer"</u>

Gonsalves contends that his attorney was ineffective when she failed to object to Bethune's alleged opinion testimony that Gonsalves was a "murderer." Docket No. 1 at 16. The SJC, however, determined that, when read in context, that statement had "different, equivocal meaning." <u>Gonsalves</u>, 488 Mass. at 840. The SJC noted that, in her cross-examination, defense counsel attempted to elicit testimony that Bethune implicated Gonsalves before the grand jury because of pressure by the police. <u>Id.</u> The exchange was as follows:

Q.: "On the way to Court, did [the police] talk to you?"

A.: "About the fact that I was protecting a murderer. They didn't talk, they didn't want to have any conversation with me."

Q.: "So you did have another conversation with police?"

A.: "I wanted to talk to them, but they didn't want to have any conversation with me regarding this, they just wanted to bring me straight to the grand jury and told me to say what I had to say there."

Q.: "So they just basically wanted you to give them a statement about [Gonsalves], correct?"

A.: "In the car with the cops, they didn't ask me for anything I was in cuffs, they were transporting me, and they were just basically telling me that I need to be truthful and why am I protecting him."

Q.: "So they thought that you were protecting him at the time, is what they were saying to you and telling you to be truthful, correct? That's what the police were telling you?"

A.: "Yeah."

Gonsalves, 488 Mass. at 840.

The SJC reasonably found that Bethune's statement about "protecting a murderer" was ambiguous at best, as it did not appear to be a statement of fact that she was protecting a murderer but rather a description of the police's questions to her. Id. at 840-41. The SJC reasoned that such a question would not matter much to the jury, because they understood the police were investigating a murder that occurred in Bethune's presence. Id. at 841. Indeed, the SJC reasonably observed the question could have provided support for Gonsalves' argument that the police jumped to conclusions about his guilt and pressed Bethune to make statements that bolstered their theory. Id. Moreover, as the SJC reasonably explained, even if Bethune had been expressing her own opinion, there was little prejudice as the jury had already heard her detailed eyewitness testimony about the murder, so it was unlikely to make any difference to them. Id.

Gonsalves also contends his attorney erred when she failed to object to the prosecution's closing statement that referenced Bethune's testimony. Docket No. 1 at 16. Gonsalves contends that he was prejudiced because the reference allowed the government to vouch for Bethune's statement. Id. The prosecutor's statement, in relevant part, is as follows:

> She told you, I only told the complete truth about what I know when I was under oath before the Grand Jury and I decided that I was no longer going to cover up for someone who committed a murder. And I suggest to you, ladies and gentlemen, that that's what happened.

Gonsalves, 488 Mass. at 841.

"[I]mproper vouching encompasses statements by the prosecutor that place[ ] the prestige of [the prosecutor's] office behind the government's case." United States v. Perez Soto, 80 F.4th 50, 57 (1st Cir. 2023) (second and third alterations in original) (citation omitted). It includes

17

when the prosecutor imparts her personal belief in a witness' veracity or the defendant's guilt. Id. However, when a prosecutor's remarks are made in an effort to counter allegations by the defense, such statements are generally not considered to be improper vouching. Id. at 58. Even in the face of an improper remark, reversible error does not occur when (1) the comment is isolated and does not appear to be part of any intentional effort to influence the jury in an improper way; (2) the comment was not flagrant in its effect; (3) the comment was not contemporaneously objected to by the defense; and (4) the government's evidence was strong. Id. at 57.

The SJC reasonably observed that, in context, the prosecutor did not present a personal opinion as to the veracity of Bethune's testimony. Gonsalves, 488 Mass. at 841. Rather, it was an attempt to counter arguments made by Gonsalves' counsel over the course of trial and repeated in her closing. Id. at 842. In addition, the government's evidence in this case, which included numerous eyewitnesses, was strong. The SJC's determinations were neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

c.      Failure To Object To A Witness' Reference To Her Religion

Gonsalves argues that he was denied effective assistance of counsel because his attorney failed to object to and move to strike Bethune's testimony that she decided to testify against Gonsalves after she "spoke to God." Docket No. 1 at 16.

The interchange at issue is as follows:

> On cross-examination, defense counsel raised statements [Bethune] had made to the police early in the investigation that were inconsistent with her trial testimony. Bethune responded by saying, "I didn't start telling the truth until I took the oath." After a few more questions, she continued, "I know that when I came from being locked up in jail so long, I decided that I spoke to God and I decided I was going to tell the truth . . . . Everything I said before that was a lie."

Gonsalves, 488 Mass. at 842.

The SJC acknowledged that it has "long and consistently disfavored allowing evidence of

18

the religious beliefs of a witness either to enhance or [to] discredit the credibility of a witness."
Gonsalves, 488 Mass. at 842 (quoting Commonwealth v. Dahl, 430 Mass. 813, 822 (2000) (alteration in original)). Considering the context of Bethune's statement, the SJC found that it was more than "the equivalent of saying she would 'do the right thing' or that it was a reference to her grand jury oath" and that it should have been struck given its potential prejudicial effect. Gonsalves, 488 Mass. at 842. The SJC reasonably explained, however, that while such statements are disfavored, they have not been found to be grounds for reversal. Id. (citing cases). Furthermore, the SJC pointed out that "Bethune's reference to speaking 'to God' was an explanation of why she decided to change her mind about testifying against the defendant, not an argument that people with certain religious beliefs are more or less trustworthy than others." Id. The SJC therefore concluded that defense counsel's failure to object and move to strike did not create a substantial likelihood of miscarriage of justice. Id.

Accordingly, the SJC's determination here was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

        d.      Failure To Object To Testimony On Witness' Fear Of Reprisal And To Request A Related Curative Instruction

Gonsalves argues that he was denied effective assistance of counsel because his attorney failed to object to the prosecutor's questions to a witness, Devon Queen, about whether he changed his testimony out of fear. Docket No. 1 at 16.

The SJC recounted the trial testimony as follows:

Queen was called by the Commonwealth, but he had to be arrested to be brought into court, and he was declared a hostile witness. At trial, Queen testified that he could not remember the appearance of the assailant or the person who took something from the victim's pocket, or from where the assailant approached the victim. Evidently, Queen had given a more specific and inculpatory statement to the police, specifically that after the victim walked away from the car, Queen saw the driver get out and approach him; that after the fight broke out, the victim was

chased by a "short guy"; and that a "taller guy" had come over to take something out of the victim's pocket. Despite being shown the police report with his statement, Queen claimed he could no longer remember these details at trial. The prosecutor responded by asking him if he could "see that man seated in the courtroom with the glasses on and the braids?"

Trial counsel immediately objected, noting at sidebar that the prosecutor seemed to be referring to the defendant's brother, who was in the gallery. The prosecutor claimed that a victim-witness advocate had told her that Queen began claiming a poor memory when the brother entered the court room, to which defense counsel responded that the brother had been present every day of trial and that Queen claimed a lack of memory from the start of his testimony. The judge noted that evidence of any intimidation by the brother was "thin" and sustained the objection.

The prosecutor later asked Queen whether he recognized the defendant and asked why he kept looking at the defendant when answering questions. Defense counsel objected, but was overruled, and Queen answered that he was not looking at the defendant. The prosecutor also asked Queen whether he left Massachusetts after witnessing the murder because he was afraid, and again defense counsel unsuccessfully objected. Queen answered that he was not afraid and that he had left because he was worried the police would think he was involved in the stabbing. Finally, the prosecutor asked why he had not come to court to testify and had to be arrested. There was no objection, and Queen answered that there was a warrant requiring him to appear at another court on the same day. On cross-examination, defense counsel got Queen to repeat his testimony that he was not afraid and the explanations for his seemingly evasive behavior. She also elicited an alternative explanation for his lack of memory -- that he had been drinking and smoking marijuana, and in fact had repeatedly told police that he was "not completely sure what happened." She also clarified some of his statements that the Commonwealth had seized on as inconsistent.

Gonsalves, 488 Mass. at 843-44.

The SJC explained that while Gonsalves argues that trial counsel should have requested a sidebar after being overruled, the trial judge who saw the interaction was in the best position to decide if there was a basis for the question. Id. at 845. Furthermore, Queen denied looking at the defendant or being afraid of anyone. Id. The SJC reasonably found that the trial judge did not abuse his discretion in overruling counsel's objections regarding the other questions related to Queen's alleged fear. Id. (citing cases). The SJC also found that trial counsel's approach of reemphasizing Queen's denials in cross-examination and providing other explanations for his

lack of memory was not ineffective. Id.

Gonsalves further contends that that his counsel was ineffective because she failed to request a curative instruction after the jury sent a note during deliberations asking if anyone had access to their personal information. Docket No. 1 at 16.

The SJC explained that after consulting the prosecutor and defense counsel, the trial judge answered the jury's question by informing them that their personal information would be destroyed and that their confidential questionnaires could only be released after a hearing with good cause shown. Gonsalves, 488 Mass. at 845. The judge also repeated his instruction that they must decide the case without "fear or favor" to either side. The SJC reasonably found (1) no error in the judge's response; and (2) that there was nothing more that defense counsel should have done. Id.

The SJC's conclusion that none of the above acts or omissions constituted errors that created a substantial likelihood of a miscarriage of justice was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. Gonsalves has not established that the SJC unreasonably applied the Strickland standard. Accordingly, this Court recommends that Judge Stearns deny habeas relief on the basis of Ground One.

      B.      Ground Two: Insufficient Evidence

Gonsalves argues that there was insufficient evidence to sustain his conviction for first degree murder on the theory of extreme atrocity or cruelty beyond a reasonable doubt. Docket No. 1 at 7, 16.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). Sufficiency of

evidence claims are governed by the Supreme Court's decision in Jackson v. Virginia, which provides that the constitutional right to due process guarantees "that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof." Jackson v. Virginia, 443 U.S. 307, 316 (1979). The relevant test is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (citations omitted; emphasis in original).

"Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." Coleman v. Johnson, 566 U.S. 650, 651 (2012). First, on direct appeal, a reviewing court may set aside the jury's verdict on the grounds of insufficient evidence only if "no rational trier of fact could have agreed with the jury." Id. (citation omitted). Second, following the standard set out in section 2254(d)(1), a federal court may overturn a state court's sufficiency analysis under Jackson only if the state court decision was objectively unreasonable. Id. "'Unreasonable' means that the decision 'evinces some increment of incorrectness beyond mere error.'" Webster v. Gray, No. CV 19-11788-FDS, 2021 WL 3915005, at *4 (D. Mass. Sept. 1, 2021), aff'd, 39 F.4th 27 (1st Cir. 2022) (citations omitted). In practice, the First Circuit has recognized that the Jackson standard is "rarely met where there is plausible evidence to support a verdict." King v. MacEachern, 665 F.3d 247, 252 (1st Cir. 2011) (citation omitted).

The SJC's conclusion was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. In rejecting Gonsalves' claim that the Commonwealth's evidence did not support a guilty verdict, the SJC applied a "sufficiency of evidence" standard set forth in Commonwealth v. Latimore, 378 Mass. 671 (1979). See Gonsalves, 488 Mass. at

834.[8] The First Circuit has held that standard to be "functionally identical" to that articulated in Jackson. Logan v. Gelb, 790 F.3d 65, 71 (1st Cir. 2015). Therefore, when the SJC reviews for Latimore error, it simultaneously answers the federal constitutional question. Roman v. Mitchell, 924 F.3d 3, 6 n.1 (1st Cir. 2019) (citations omitted).

The Gonsalves trial occurred in February 2017, prior to the SJC's decision in Commonwealth v. Castillo, 485 Mass. 852, 865-67 (2020), which prospectively[9] changed the requirements for finding extreme atrocity or cruelty. Id. The SJC was therefore required to use the seven Cunneen factors when determining whether a verdict could have been sustained by the jury at the time of the trial in 2017. Gonsalves, 488 at 834. The Cunneen factors include: (1) indifference to or taking pleasure in the victim's suffering; (2) consciousness and degree of suffering of the victim; (3) extent of physical injuries; (4) number of blows; (5) manner and force with which delivered; (6) instrument employed; and (7) disproportion between the means needed to cause death and those employed. Commonwealth v. Cunneen, 389 Mass. 216, 227 (1983). A finding of at least one of these factors served to sustain a guilty verdict at the time of Gonsalves' trial. Gonsalves, 488 at 834. The SJC found that the evidence could have supported a finding of extreme atrocity or cruelty based on at least three factors. Id.

1.    Disproportion Between The Means Needed
To Cause Death And Those Employed

Gonsalves argues that the five stab wounds are insufficient to establish extreme atrocity and cruelty. Docket No. 31 at 29. However, in its analysis, the SJC considered that Gonsalves "stabbed the victim five times in vital areas, and may have stabbed him a sixth time without fully

---

[8] In Gonsalves, the SJC quoted Commonwealth v. Andrade, 488 Mass. 522, 543 (2021), which quoted Commonwealth v. Jones, 477 Mass. 307, 316 (2017), which in turn cited to Latimore.
[9] The revised Castillo factors "are to be applied only in murder trials that commence after the date of issuance of this [October 6, 2020] opinion." Castillo, 485 Mass. at 866.

withdrawing the blade. Each could have been independently fatal, indicating the attack was 'brutal and disproportionate.'" <u>Gonsalves</u>, 488 at 834 (citing <u>Commonwealth v. Rodriguez</u>, 461 Mass. 100, 104-05 (2011)).

The Commonwealth's evidence showed that the first stab wound passed between two of the victim's ribs into his right lung, which caused bleeding in his chest cavity and air to escape from his lungs. <u>Id.</u> at 831. The second wound penetrated the victim's sternum and pierced his heart. <u>Id.</u> The third passed between two of the victim's ribs into his liver. <u>Id.</u> The fourth penetrated four inches into the victim and hit both his liver and a major blood vessel. <u>Id.</u> The fifth wound was three inches deep and passed through the victim's abdominal wall into the liver. <u>Id.</u> One of the stab wounds caused two separate injuries to the liver, indicating that the victim either moved while the knife was in his abdomen or that the knife was partially withdrawn and then stabbed inwards again. <u>Id.</u> The SJC reasonably concluded that a rational trier of fact could have found sufficient disproportionality between the means needed to cause the victim's death and those employed by Gonsalves.

2.   <u>Indifference To Or Taking Pleasure In The Victim's Suffering</u>

The Commonwealth's evidence showed that after Gonsalves stabbed the victim, he returned to his car with a bloody knife, wiped the knife off on his shirt, threw it out the window, and repeatedly stated that he "poked the n---- up" or "poked the kid." <u>Id.</u> at 830. The SJC observed that this evidence showed Gonsalves' indifference to the suffering he had caused the victim. <u>Id.</u> at 834. In addition, the SJC pointed to Rascoe's response, calling Gonsalves an "idiot" and inquiring whether Gonsalves was attempting to impress his girlfriend, as indicative of Rascoe's interpretation of the statements as "a boast or celebration." <u>Id.</u> at 835 (citing cases).

Gonsalves argues that he was not indifferent or showing pleasure because he was not near

the victim and did not know the victim had died when he made statements about "poking" him. Docket No. 31 at 29. However, the SJC reasonably concluded that from the facts evinced by the Commonwealth, a rational trier of fact could have found that Gonsalves was, at minimum, indifferent to the victim's suffering.

3.   Consciousness And Degree Of Suffering Of The Victim

Gonsalves contends that the SJC's finding that the victim's consciousness and degree of suffering were apparent from (1) the wounds inflicted on his chest and abdomen; and (2) that he was able to walk for a short period of time before collapsing, was "contrary to the facts." Docket No. 31 at 29. The Commonwealth, however, presented evidence from eyewitness accounts and surveillance footage that showed the following:

> The victim was stabbed in the lungs, heart, and liver. He was able to walk back down the sidewalk to the convenience store and into the store itself. He knelt down, holding his stomach, and attempted to say something to his friends, although they "couldn't clearly hear what he was saying."

Gonsalves, 488 at 835. Given the wounds inflicted, the eyewitness accounts, and the surveillance footage, the SJC found that the evidence clearly supported the jury's verdict. Id.

Gonsalves points to the fact that there was no evidence that the victim remained conscious after his second fall meaning that the victim's conscious suffering was not long. Docket No. 31 at 26. He also argues that the victim's suffering was not extremely atrocious or cruel as compared to other cases.[10] Id. However, from the fact that the victim, after being stabbed multiple times in vital areas, rose and managed to walk from the parking lot into the store before collapsing again, the jury could have reasonably concluded that he did in fact suffer from those injuries. See Rodriquez, 461 Mass. at 105 (citing cases). The SJC reasonably concluded that a

---

[10] Although Gonsalves compares his case to Castillo, the facts do not align. Docket No. 31 at 26-27. In Castillo, the victim was shot once in the back. Castillo, 485 Mass. at 855.

rational trier of fact could have found sufficient consciousness and degree of suffering, particularly in combination with the other <u>Cunneen</u> factors in this case, to sustain a guilty verdict.[11]

In light of the above, the SJC's decision satisfies <u>Jackson</u>'s standard because a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson</u>, 433 U.S. at 319. Moreover, the decision does not show an "increment of incorrectness beyond mere error." <u>Winfield v. O'Brien</u>, 775 F.3d 1, 8 (1st Cir. 2014). Therefore, insufficiency of the evidence is an inadequate ground on which to grant habeas relief. Accordingly, I recommend that Judge Stearns deny habeas relief on the basis of Ground Two.

IV.   <u>RECOMMENDATION</u>

For the foregoing reasons, this Court recommends Judge Stearns deny Gonsalves' petition in its entirety.

---

[11] The SJC did not end its analysis with the <u>Cunneen</u> factors. It considered the outcome under the <u>Castillo</u> factors as well. <u>Gonsalves</u>, 488 at 835 n.2. Specifically, the SJC explained that the jury would have been instructed to consider:

> 1. Whether the defendant was indifferent to or took pleasure in the suffering of the deceased;
>
> 2. Whether the defendant's method or means of killing the deceased was reasonably likely to substantially increase or prolong the conscious suffering of the victim; or
>
> 3. Whether the means used by the defendant were excessive and out of proportion to what would be needed to kill a person.

<u>Id.</u> Under <u>Castillo</u>, a jury may find extreme atrocity or cruelty as long as it is based on at least one of these three factors. <u>Castillo</u>, 485 Mass. at 866. The SJC determined that under <u>Castillo</u>, although Gonsalves might not meet the second factor, he would still meet the first and third factors. <u>Gonsalves</u>, 488 at 835 n.2 It also explained that while <u>Castillo</u> "clearly expresses disapproval of finding extreme atrocity or cruelty 'based solely on the degree of the victim's conscious suffering,'" there was "ample evidence to support a finding of other <u>Cunneen</u> factors that relate to the 'egregiousness of the defendant's conduct.'" <u>Id.</u>

V.    REVIEW BY DISTRICT JUDGE

The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of service of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Phinney v. Wentworth Douglas Hospital, 199 F.3d 1 (1st Cir. 1999); Sunview Condo. Ass'n v. Flexel Int'l, Ltd., 116 F.3d 962 (1st Cir. 1997); Pagano v. Frank, 983 F.2d 343 (1st Cir. 1993).

/s/ Jennifer C. Boal
JENNIFER C. BOAL
United States Magistrate Judge